IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 1, 2021

## IN RE ENRIQUE F. ET AL.

**Appeal from the Chancery Court for Lawrence County**
**No. 18-18519      Stella L. Hargrove, Judge**

_____

## No. M2019-01765-COA-R3-PT

_____

This is an appeal from a termination of parental rights proceeding. Although the trial court found that certain grounds for termination were established against the children's father, it determined that there was insufficient proof that termination was in the children's best interests. On appeal, the guardian ad litem and prospective adoptive parents challenge the trial court's best interests determination, as well as the trial court's failure to conclude that other grounds for termination were established. Our review of the record reveals that no grounds for termination were properly found by the trial court, and we therefore affirm the trial court's denial of the petition to terminate on this basis.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part and Remanded.**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and JOHN W. MCCLARTY, JJ., joined.

Amy Long Schisler, Lawrenceburg, Tennessee, Guardian Ad Litem.

Teresa P. Martin, Lawrenceburg, Tennessee, for the appellees, D.E.W. and K.R.D.

Teresa B. Campbell, Lawrenceburg, Tennessee, for the appellee, E.F., Sr.

## OPINION

## BACKGROUND AND PROCEDURAL HISTORY

This appeal concerns two minor children, E.F. and H.F. ("the Children"), and the trial court's decision that the parental rights of their father, E.F., Sr. ("Father"), should not

be terminated.[1] Although the underlying termination petition was filed in July 2018 by the Children's guardian ad litem ("the GAL"), as well as the Children's paternal grandmother ("Grandmother") and her husband (collectively "the Grandparents"),[2] the precipitating facts are traceable back to the fall of 2014, shortly after the birth of H.F., who was born premature. According to a doctor's note that the Department of Children's Services ("the Department") later attached to a dependency and neglect petition, significant concerns existed as to H.F.'s weight and whether he was being fed properly. The doctor's note, which provided a summary of the doctor's care of H.F. since his birth, alluded to the fact that the Department had been consulted and further referenced concerns that existed as to E.F., noting that at one visit E.F. had a diaper that appeared to have been on him for over 24 hours. As to Father, the note alluded to a seemingly contentious relationship between Father and the Children's mother and stated that Father "seldom attended the weight recheck visits" for H.F.[3] Although the doctor noted that it was "confusing" that the weight concerns that existed as to H.F. had never been a specific problem for E.F., the doctor stated that his suspicion of neglect was "pretty much" confirmed after H.F. was admitted for care in March 2015. That same month, the Children[4] were placed into the custody of the Department by order of the Lawrence County Juvenile Court. Father[5] later waived an adjudicatory hearing regarding the Children and agreed that they were dependent and neglected.

Under a family permanency plan that was developed, Father was given several responsibilities. According to the later trial testimony of a Department family services worker who was the Children's case manager from March 2015 until August 2016, concerns mainly existed as to whether Father had safe housing and stable employment. Regarding these matters, however, the family services worker testified that Father's home had been appropriate sometimes. She also stated that Father had sometimes provided income documentation. Further, the family services worker testified that Father reported getting mental health treatment at the VA and that he had signed releases for her to get that

---

[1] Because this Court has a policy of protecting children's identities in parental termination cases, we present certain names by their initials in this Opinion.

[2] Although the record indicates that Grandmother's husband is not the Children's biological grandfather, we refer to him and Grandmother collectively as "the Grandparents" herein for ease of reference.

[3] Father later testified at the termination trial in this case that he was working during a lot of H.F.'s doctor's appointments.

[4] Another child of Father's was the subject of the Juvenile Court's order finding probable cause that the Children were dependent and neglected, but parts of the record reflect that this other child was then in Texas with her mother. Per the Juvenile Court's order, the Department was ordered to pick up the child when she returned to Tennessee. This evidently never occurred, and a later order awarded temporary legal custody of the child to her mother, "pending further hearing." This other child is not at issue in this case. Also not at issue in this case is Father's new daughter, who lives with Father and his new wife.

[5] We have largely tailored our factual recitation herein to Father given that the rights of the Children's mother are not at issue on appeal. The record reflects that the Children's mother executed a surrender of her parental rights.

information; that Father completed an alcohol and drug assessment; that Father did work with a batterers' intervention program; and that Father did parenting classes. When the permanency plan was revised in November 2015, adoption was added as one of the permanency goals. Father disagreed with this change.

According to the Department, Father's relationship with the Children's mother was of concern, in part, due to the on-again, off-again character of the relationship during certain periods. Moreover, whereas it was noted that Father had completed a lot of the steps on his permanency plan, the mother's failure to complete her permanency plan steps was identified as something that hindered Father from getting the Children. As discussed later in this Opinion, Father no longer lived with the Children's mother at the time of the trial of this matter, but he instead lived with a new wife, to whom he had been married since 2017.

Initially, the Children were placed with a paternal aunt after their removal, but according to the Children's case manager, they had to be removed from the aunt's home due to environmental concerns. The Children were then moved into a foster home for several months. Thereafter, the Children were placed with Grandmother, and effective August 9, 2016, temporary custody of the Children was divested to her. The Department had no further communication or activity with the family after custody was divested to Grandmother.

The termination trial was heard over the course of two days in August 2019 by the Lawrence County Chancery Court ("the trial court"). The proof at trial covered a range of issues. Among other things, the evidence chronicled the various placements of the Children after their removal and also detailed Father's relationship with them. Although extensive proof was offered as to the conditions of Father's home around the time of the Children's removal and at different points thereafter, the GAL and the Grandparents offered very little proof as to the conditions of his home contemporaneous to the trial proceedings. Most of their witnesses had either not been in his home in years or had not been in his home at all.

As for Father's visitation with the Children that occurred after their removal, the proof revealed that Father was attentive to the Children and that the Children enjoyed their visitation with him. Evidence also showed that Father had been largely compliant in his payment of support for the Children in the four months preceding the filing of the termination petition. Grandmother specifically testified that Father had been compliant with his support obligations three of the four months, but she did note that in one of these months, Father only paid approximately $140 out of his ordered $200 per month obligation.

At the time of trial, Father was living with his current wife and their daughter. In contrast to the lack of evidence offered by the GAL and the Grandparents as to the current conditions of his home, Father and his wife testified as to improvements that had been

made.   Father also introduced photographs of the home's interior and its upkeep. Grandmother testified that she had never called the Department about Father's new child, and when recounting an occasion where she had seen her new granddaughter, Grandmother agreed that she looked healthy and happy, stating, "She seems fine."

Grandmother testified that she had previously used Father's current wife as a babysitter for the Children about three to four days a week.  According to Grandmother, this "[m]aybe" occurred over a period of two or three months.  Per Father's testimony, the period was somewhere between six to eight months.  Regardless of the specific timeframe, Grandmother ultimately decided to stop using Father's wife to babysit because, according to her testimony, she had concern that Father's wife was not paying sufficient attention to the Children.  Father's wife, on the other hand, testified that she had a strong bond with the Children.

As for his employment, Father's testimony revealed that he had a job at SERVPRO where he performed various kinds of restorative work at homes.  His testimony further revealed that he was medically retired from the military due to injuries sustained in Iraq and that he received $1,100 in monthly VA benefits.[6]  Although Father acknowledged that he bore some responsibility for the Children's removal, he testified that he loved them dearly and hoped to keep his rights.

Upon the conclusion of trial, the case was taken under advisement.  On August 29, 2019, the trial court entered its order denying the petition to terminate Father's parental rights.  The trial court's order analyzed four grounds for termination: abandonment by failure to support, abandonment by failure to visit, persistence of conditions, and failure to manifest an ability and willingness to assume custody or financial responsibility.  The trial court concluded that the former two grounds of abandonment did not apply in this case but ruled against Father on the latter two grounds.  Notwithstanding its determination that two grounds for termination had been established, the trial court ultimately concluded that "the facts of this case do not amount to clear and convincing evidence that termination is in the children's best interests."  Among other things, the trial court cited the close relationship that existed between Father and the Children.

This appeal followed.

**STANDARD OF REVIEW**

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re M.L.P.*, 228 S.W.3d 139, 142 (Tenn. Ct. App.

---

[6] He testified that his benefit amount was supposed to be "around 1400" but indicated that he was still in the process of fixing paperwork issues about the amount.

2007). "Although this right is fundamental and superior to claims of other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). In Tennessee, "[w]ell-defined circumstances exist under which a parent's rights may be terminated." *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015). Pursuant to the Tennessee Code, parties who have standing to seek the termination of a parent's parental rights must prove two things. They must first prove at least one of the statutory grounds for termination. *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)). Then, they must prove that termination of parental rights is in the child's best interests. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

Because the decision to terminate a parent's parental rights has "profound consequences," trial courts must apply a higher standard of proof in deciding termination cases. *In re M.L.P.*, 228 S.W.3d at 143. "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007). This heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d at 143.

Due to the heightened burden of proof required under the statute, we must adapt our customary standard of review. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.*

## DISCUSSION

As discussed previously, although the trial court found that two grounds for termination were established in this case, it ruled that two other grounds for termination were not established and also determined that there was insufficient proof that the termination of Father's rights was in the Children's best interests. On appeal, the GAL and the Grandparents assert that the trial court erred in failing to find additional grounds for termination and in its best interests ruling. We will begin our appellate review by focusing on the statutory ground issues argued by the GAL and the Grandparents.

*Abandonment*

The first ground for termination listed in Tennessee's termination statute is abandonment. *See* Tenn. Code Ann. § 36-1-113(g)(1). The acts that constitute abandonment are outlined in Tennessee Code Annotated section 36-1-102, which provides alternative definitions. *See* Tenn. Code Ann. § 36-1-102; *see also In re Jayden B.T.*, No. E2014-00715-COA-R3-PT, 2015 WL 3876573, at *9 (Tenn. Ct. App. June 23, 2015) (noting that the statutory definition of abandonment "contains several distinct grounds"). Here, two distinct grounds for abandonment were relied upon by the GAL and the Grandparents: Father's alleged failure to visit the Children and Father's alleged failure to support the Children. The relevant statutory language pertaining to these grounds now reads as follows:

> (1)(A) [Abandonment means that]:
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents . . . either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;
>
> . . . .
>
> (B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;
>
> (C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;
>
> (D) For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's support" means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period;
>
> (E) For purposes of this subdivision (1), "failed to visit" means the failure,

for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period;

. . . .

(I) For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent[']s . . . failure to visit or support was not willful. The parent . . . shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102.

We discern no error in the trial court's ultimate conclusion that the two abandonment grounds relied upon by the GAL and the Grandparents in this matter do not apply. Indeed, as explained below, we conclude there is not clear and convincing evidence supporting Father's alleged failure to support or visit the Children in the four months preceding the filing of the termination petition. We will begin our discussion by addressing the visitation issue before turning to the support issue.

Pursuant to the terms of the trial court's order, the court implicitly held that Father had engaged in only token visitation by ruling that he "failed to visit with his children during the statutory period." We disagree with this conclusion for the reasons stated *infra*, but it is unclear to us whether this was actually an intended holding of the trial court. Indeed, the cited basis for the trial court's ultimate conclusion as to why this ground should not apply—i.e., that Father was not willful—is lacking in explanatory detail, and this gives us reason to question whether the trial court may have perhaps somehow conflated the willfulness inquiry with the question of whether Father's visitations were token ones.[7] We

_____

[7] When it ultimately concluded that this ground for termination should not apply, the trial court found that Father's failure to visit was not willful. Yet, when previously addressing certain alleged barriers to Father's visitation, namely the presence of Grandmother's husband, the trial court stated that Grandmother's husband did "not provide an excuse" for Father's failure to visit. If the trial court was contemplating the presence of Grandmother's husband as the basis for its holding on the willfulness question, its ultimate conclusion is at odds with its finding that the presence of Grandmother's husband did not afford Father any excuse. After all, "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009). The court's order did seemingly acknowledge that Grandmother's husband made the exercise of visitation difficult for Father, but we again note that the trial court did not find this to qualify as any excuse. Perhaps the trial court was pointing to conduct of Grandmother as a justification for its holding on Father's lack of

question this especially considering that other findings by the court view Father's visitations in a positive manner and not as something that were of "such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102. Indeed, in a separate section of its order, the trial court specifically noted that Father had maintained regular visitation[8] and that a close and meaningful relationship existed between him and the Children, findings that are seemingly inconsistent with the court's implicit token finding. Regardless of what the court was intending to hold here, because we conclude the record does not support the trial court's implicit textual holding that Father's visitations were token, this ground was not properly established.

The trial court found that Father had visited with the Children for approximately 42.75 hours in the relevant four-month period preceding the filing of the termination petition. This exercised visitation was out of a possible 120 hours,[9] thus approximately 36% of the time available to Father. As alluded to before, Father no doubt attributed much blame to the Grandparents in this case as to why he had not exercised more visitation, but several of his visits were cut short when he was called into work. Grandmother's own notes memorializing Father's visits detailed this.

Although much emphasis has been made by the GAL and the Grandparents that Father exercised less than half of the available visitation time afforded him, it is clear from caselaw that mere mathematical percentages do not control the question of whether a parent's visitation is token. This was notably illustrated by this Court's prior analysis in *In re Addalyne S.*, 556 S.W.3d 774 (Tenn. Ct. App. 2018), specifically the manner in which we distinguished that case from a prior opinion, *In re L.J.*, No. E2014-02042-COA-R3-PT, 2015 WL 5121111 (Tenn. Ct. App. June 29, 2015). In relevant part, we dealt with the issue of alleged token visitation in *In re Addalyne S.* as follows:

> We . . . conclude that the Grandparents failed to prove this ground by clear and convincing evidence. The trial court found, and there is no dispute on appeal, that Mother exercised eight of twenty-two, or approximately 36%

---

willfulness, and it is true that Father did attribute blame to his mother at trial for his failure to visit the Children more. With that said, in one portion of its order, the trial court specifically questioned Father's credibility that he had requested Grandmother for more hours. The trial court did not offer a specific explanation as to why it was concluding that Father was not willful, and although we might perhaps infer that it accredited *portions* of Father's testimony that the Grandparents had restricted visitation, the only specific engagement by the court with respect to such issues were all against Father, as noted above. We need not consider the matter any further, however, in light of our conclusion that the record does not support a finding that Father's visitations with the Children were token.

[8] This specific finding about "regular visitation" was not specifically linked to the relevant four-month period, but we are of the opinion that the evidence supports such a finding.

[9] It is of no real consequence to our analysis herein, but we note that Grandmother initially testified upon questioning by her attorney that the total number of available hours in the period was 112.

of, potential visits[10] with Addy during the relevant time period. Further, Mother testified that Addy calls her "Mommy." Additionally, there is evidence that Mother and Addy like to do many activities together during Mother's visitation such as playing outside together or doing makeup and hair, and that they are affectionate towards one another during visits.

Mother's amount of visitation certainly borders on being token. Indeed, at least one Tennessee court has held that a mother who completed 37.5% of her potential visits during the relevant time period only engaged in token visitation. *See In re L.J.*, No. E2014-02042-COA-R3-PT, 2015 WL 5121111, at *4–*6 (Tenn. Ct. App. June 29, 2015). In *In re L.J.*, mother attended three of her eight, or 37.5% of her scheduled visits with her child. *Id.* at *4. The mother argued that attending 37.5% of visits amounts to more than token visitation, but the trial court disagreed. *Id.* In affirming the trial court's decision, the court considered a multitude of factors in determining whether the mother's visitation was, in fact, token. *Id.* at *4–*6. These factors included the quality of the visits, the relationship between the parent and child before the four-month period, the quantity of visits, and whether the visits were sufficient to create and maintain a bond between parent and child. *Id.* at *4–*5. Reviewing the evidence, the Court concluded that the mother's visits were generally of poor frequency and mediocre quality, that the mother and child had little relationship even prior to the four-month period; the court therefore likened the mother's situation to a case wherein a parent's perfunctory visits were insufficient to establish any meaningful relationship with the child. *Id.* at *4 (citing *State Dep't of Children's Services v. L.L.T.*, No. E2003-00501-COA-R3-JV, 2003 WL 23094559, at *4 (Tenn. Ct. App. Dec. 30, 2003) (noting that "absolutely no evidence that a meaningful relationship was ever established between [m]other and child.")). The Court additionally noted that when mother provided an excuse for missing visitation, she "attributed it to a lack of transportation and work conflicts." *Id.* at *5. The Court noted, however, evidence in the record to undermine mother's testimony on this issue, as child services workers testified that they assisted mother with transportation. *Id.* Under the totality of these circumstances, the c[ourt] held that the petitioners provided sufficient proof that mother's visitation was no more than token. *Id.* at *5–*6.

At first blush, the facts of *In re L.J.* appear to be analogous to the case-at-bar. Indeed, Mother attended a similar, but even lesser amount, of

---

[10] In the *In re Addalyne S.* decision, the visitation percentages are framed in reference to the number of available visits. In this case, the Grandparents and the GAL have employed percentages in reference to the number of available visitation hours.

visitation over the relevant time period, had problems with reliable transportation, and Mother and Addy's relationship was also built during her scheduled, supervised visits. Token visitation, however, is analyzed in regard to the "circumstances of the individual case." Tenn. Code Ann. § 36–1–102(1)(c). As such, this Court has never imposed a bright-line rule as to what percentage of visitation must be attended in order avoid categorization as token. *Compare In Re Jayden B.T.*, No. E2014-00715-COA-R3-PT, 2015 WL 3876573, at *8 (Tenn. Ct. App. June 23, 2015) (holding that petitioners failed to prove that visitation was token where the parent made only two visits in four months); *In re E.M.P.*, No. E2006-00446-COA-R3PT, 2006 WL 2191250, at *5 (Tenn. Ct. App. Aug. 3, 2006) (holding that given the "sparse record," petitioners failed to provide clear and convincing evidence that mother's single visit to the child in the four month period was token under the circumstances), *with In re Audrey S.*, 182 S.W.3d 838, 867 (Tenn. Ct. App. 2005) (holding that one or two visits in four months was "nothing more than token visitation"). *In re L.J.*, 2015 WL 5121111, at *4–*6 (holding that three visits in four months was no more than token visitation). Indeed, we have recognized that each termination of parental rights case requires "individualized decision making[,]" rather than the application of bright-line rules. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) ("Because of the gravity of their consequences, proceedings to terminate parental rights require individualized decision making.").

Although the percentage of visitation in this case is similar to *In re L.J.*, other facts lead us to reach a different conclusion in this case. Here, unlike the mother in *In re L.J.*, the trial court found that Mother was able to maintain a meaningful relationship with Addy through the somewhat meager visitation that she attended. This Court has previously considered whether a parent's visitation was sufficient to "establish a meaningful relationship or bond between [the parent] and the children" in determining whether visitation was token. *In re Kaylee F.*, No. M2012-00850-COA-R3PT, 2013 WL 1097791, at *3 (Tenn. Ct. App. Mar. 15, 2013).

. . . .

Mother's visits were more than perfunctory and were frequent enough to establish more than minimum or insubstantial contact with Addy; thus, Mother's visitation does not meet the definition of token visitation under our termination statutes. *See* Tenn. Code Ann. § 36–1–102(C). We therefore affirm the trial court's determination that Grandparents failed to provide clear and convincing evidence that Mother willfully failed to visit her child.

*In re Addalyne S.*, 556 S.W.3d 774, 785–86 (Tenn. Ct. App. 2018).

The record reveals that the visitation in the present case was more than perfunctory visitation. Father was entitled to, among other rights, six hours of unsupervised visitation with the Children every other Saturday. He did not ultimately avail himself of all available hours; there is no dispute about that. Nonetheless, Father maintained regular visitation and often engaged in visits that lasted multiple hours with the Children. As Grandmother testified, Father "did the Saturdays."[11]

Father's visits were, by all accounts, meaningful ones. Grandmother testified that Father interacted with the Children and that he "gets out and plays with them." "They have fun," she noted, and indicated that the Children enjoyed the visits. Grandmother also noted that Father brought the Children food and snacks, notably breakfast and pancakes from McDonald's. She claimed that Father always brought breakfast and that he was always very attentive to the Children when he came. Per her testimony, there were not really any problems with the visits, outside of the caveat that the Children had sometimes stood on furniture, "things like that . . . that the boys know they're not supposed to do." The gist of Grandmother's testimony on this issue was confirmed by that of her husband. He testified that Father "takes care of the children" during visitation. Moreover, as to Father's habit of bringing breakfast on his visits, Grandmother's husband stated, "You know, he does that beautiful." He further testified that, "[W]hen it comes time for lunch, he'll make their lunch." Grandmother's husband also agreed that Father was "very interactive" with the Children on his visitation days.

Father's testimony also cast a positive light on his visits and relationship with the Children. In relevant part, he stated as follows:

[T]hey both get excited every time I come over. They both tackle me at the front door. They both -- if they're allowed out on the front porch, they stand right there on the front porch waiting on me to get out of the truck and walk up to them.

In testifying about the Children at trial, Father was able to express opinions on how they differed in their personalities. They were, he claimed, "the light of my life."

This is not a case where minimal contact was made with the Children. The record reveals that Father had a relationship with the Children before the relevant four-month period,[12] and it is further evident that Father made multiple visits within the statutory time frame for a total of nearly 43 hours. Moreover, as noted, Father, Grandmother, and

---

[11] This is not to say that Father only saw the Children on Saturdays. By way of example, Grandmother testified to an occasion where Father came for a visit on a Wednesday for a make-up.

[12] By way of example, the Children had previously gone to visit Father at his home while in the care of their foster mother.

Grandmother's husband all had positive accounts of the visits that occurred. There clearly was sufficient evidence for the trial court to conclude, as it did in the best interests section of its order, that there was a "close and meaningful relationship" between Father and the Children, and given the individualized facts of this case and in view of the considerations articulated in *In re Addalyne S.*, it is clear to us that Father's visitation in this case was not token. Therefore, for this specific reason, we affirm the trial court's decision that this ground for termination was not established.

Having addressed the trial court's finding on abandonment by Father's alleged failure to visit, we turn to Father's alleged failure to support the Children. We need not tarry long in our discussion of this ground. There does not appear to be any dispute that Father was compliant with his support payments for three out of the four months preceding the filing of the petition. The Grandparents' brief on appeal even recites that he was "pretty much compliant" except for one month. At trial, Grandmother testified that Father only paid approximately $140 out of his ordered $200 per month obligation in one of the relevant months. Father clearly paid more than token support during the pertinent period, and we find the arguments offered by the GAL and the Grandparents on appeal to be without merit. More or less sidestepping the question of what the proof shows to have occurred during the relevant statutory period, they all attempt to point to alleged payment shortcomings by Father by referencing facts *prior* to the relevant statutory period, with the Grandparents going so far as to argue that Father never gave justifiable reasons for his failure to pay certain amounts "before and after the four (4)-month critical period." Because the proof is clear that Father substantially made his support payments during the relevant period, we accordingly affirm the trial court's disposition with respect to this ground.

Having now addressed the issues raised on appeal regarding the statutory grounds for abandonment that the trial court rejected, we turn our attention to the grounds for termination found *against* Father. We do this notwithstanding the fact that Father does not raise any direct issue about these grounds on appeal. Indeed, Tennessee Supreme Court precedent instructs us to review the trial court's findings as to each ground for termination. *See In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016); *see also In re Zayne P.*, No. W2017-01590-COA-R3-PT, 2018 WL 2041573, at *6 (Tenn. Ct. App. Apr. 30, 2018) (reviewing a ground for termination found by the trial court even though ground was unchallenged by parents in an appeal by foster parents stemming from the trial court's dismissal of termination petition).

*Persistence of Conditions*

The termination ground commonly known as "persistence of conditions" applies when

> [t]he child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3)(A).

In this case, it is apparent from the trial court's order that the conditions the court considered problematic under this ground related to Father's home. Indeed, immediately prior to its "Ruling" that this ground had been established, the trial court commented that it was "gravely concerned that [Father's] trailer is unfit for human habitation." Preceding this comment, the court's order contained two pages devoted to detailing certain testimony and other evidence presented at trial regarding Father's home, a significant portion of which did not relate to the time of trial. The cited evidence's temporal focus is not surprising, because as alluded to previously and explained in more detail below, most witnesses who testified about Father's home had not been in it in years.

There is no question that the record casts doubt on the suitability of Father's home as it existed at the time of the Children's removal and at certain points thereafter.[13] The trial court accurately recited much of the testimony concerning this matter in its order, and we need not tax the length of this Opinion by engaging with such evidence here. What we take issue with here is the apparent holding by the trial court that there is clear and convincing evidence of such conditions in Father's home contemporaneous to the trial proceedings. One of the witnesses whose testimony the trial court cited was the Children's

---

[13] Whatever concerns did exist were not necessarily constant according to the testimony presented. The Children's case manager, for instance, testified that Father's home was appropriate sometimes.

case manager; her involvement with this case ceased in August 2016. Her testimony was unequivocal that she had not been in Father's home in three years. Similarly, the Children's foster mother, who took the Children to visit Father's home while they were in her care, ceased being directly involved in the Children's care in the spring of 2016. Her testimony,[14] therefore, also bore no relation to the actual conditions of Father's home contemporaneous to trial. The Grandparents' testimony did not offer contemporaneous accounts of the home either. Grandmother testified that the last time she was in Father's home was probably "a year or more," "may have been more than a year and a half" ago.[15] Grandmother's husband testified that he had never been in the home.

One witness called by the Grandparents during trial was a friend of Father's[16] who had previously lived with Father around the time when H.F. was born. Although much of the friend's testimony recounted troubling aspects of the home that existed previously, with the friend opining that it was not an appropriate environment for children "[a]t the time," he did not provide a similar picture of the home contemporaneous to the time of trial. This is notable given the fact that he had recently been in the home. The friend testified that, when he does go to Father's home, he only goes to the living room "to talk" for a minute or two. His testimony indicated that he did not go "all throughout the house." As for a recent occasion the week before trial when the friend "poked" his head in Father's home to invite Father to have some hotdogs and hamburgers, the friend testified favorably for Father on the one hand, while also remaining entirely ignorant about certain matters regarding the house. In relevant part, he stated, "It -- it's definitely cleaner than when it was, but it just -- it looks lived in, you know. I didn't -- I didn't notice whether the floor had been finished in the kitchen or not, if that's what you mean[.]" We fail to see how this account in any way clearly establishes that Father's home was unfit for habitation given (1) its limited scope and (2) the positive nature of what was observed, i.e., that the home was "definitely cleaner."

The friend's limited observation that the home was "cleaner" was supported by photographic evidence submitted by Father depicting the home's interior around the time of trial. The photographs submitted by Father depict a generally tidy home. They reveal, among other things, that there are sleeping rooms with beds; a bathroom with a toilet, sink, and shower; a living room with a sectional couch, television sets, mirror, and a rug; and a kitchen with a stove and oven, microwave, refrigerator, cabinets, and flooring.[17] Proof of

---

[14] As it was, despite casting some aspersions on Father's home, the foster mother also testified that she "didn't really look real close" when asked by the GAL if the home had been safe and appropriate.

[15] Father testified that neither the Department, the GAL, nor Grandmother had come to visit his home in the last three years.

[16] Among other things, he also had been previously married to the Children's paternal aunt.

[17] Our specific highlighting of flooring in the kitchen should not be construed to suggest that the other rooms depicted in the photographs lack flooring. We merely highlight the issue of flooring in the kitchen due to the fact that the absence of flooring in the kitchen had previously been a topic during the pendency of the case.

these latter features of the kitchen, cabinets and flooring, specifically confirm certain aspects of the testimony offered by Father and his wife as to improvements they had made to the home.  Father stated that new flooring had been put down all the way through the house, and he also testified that new windows and cabinets had been installed.  Father's wife noted that their home was clean, that there were new floors in the house, that the house had been painted, and that the windows had been changed.

Having reviewed the record, we can certainly understand why the trial court had concerns about the home based upon evidence of its conditions around the time of H.F.'s birth and based on the evidence pertaining to the home's conditions at times in the wake of the Children's removal.  Yet, as noted above, the GAL and the Grandparents did not offer such a picture of the home as it existed at the time of trial.  The evidence before us fails to show that Father's home is inappropriate for living, and although not dispositive of our conclusion in any way, we find it telling that Grandmother has not called the Department with any concerns about her new granddaughter living in the home.  As previously noted, Grandmother agreed that her granddaughter looked healthy and happy when she saw her.

Also telling is the GAL's argument on this matter in closing.[18]  The only evidence cited to by the GAL in support of her assertion that Father had failed to secure an appropriate home was that the "*yard* is unfit for any child to play in." (emphasis added)  No argument was specifically offered on the actual interior of the home where Father lives.  Again, this is not surprising given the paucity of negative proof that existed as to the livability of the home contemporaneous to the time of trial.

As for the argument offered that the yard was unfit for play, we note, again, the importance in recognizing the state of Father's contemporaneous conditions.  There is no dispute that many concerns were raised with the suitability of Father's yard in this case, and there was certainly evidence that it may have been unsuitable at times for the Children to play in during prior periods.  The Children's case manager noted that there had often been glass bottles in Father's yard while she was on the case, and there was other testimony that Father's yard was previously "grown up."  The proof showed, however, that Father's yard was maintained and relatively free from clutter at the time of trial.  In relevant part, we note the testimony of Father's friend, who was called as a witness by the Grandparents.  Father's friend stated that he can see Father's yard from his own home and testified that the "yard kind of stays cut now because he's got a lawnmower."  He further testified that Father had "picked up the gist of his yard and has just started to consolidate a lot of that stuff a lot better."  When questioned about the matter, he further stated that he had not seen broken beer bottles in Father's yard.

In an ostensible attempt to show that Father's yard was inappropriate, the GAL

---

[18] We observe that the Grandparents' counsel waived her closing argument.

introduced photographs of Father's yard, which she claimed were taken the week of trial on her son's phone. Respectfully, we fail to see how these photographs paint a different picture than the account offered by Father's friend. The yard appears to be cut and relatively free from any debris.[19] The photographs reveal that there is an open green space in which children can play.

As alluded to above, a concern has been raised in this case regarding the subject matter of trash at Father's property. Where Father lives, which is "out in the country" according to the evidence at trial, trash service is not provided. When Father's friend first moved in with Father years ago, he claimed Father "was having a hard time trying to figure out where to put the trash." Father's friend recommended that Father should burn his trash; he also suggested that Father could put the trash behind a "giant berm" behind Father's house. Father did in fact place his trash behind the berm, and although Father's friend stated that he did not know how Father took care of his trash around the time of trial, he said there was still some trash back there and observed that Father had not historically burned his trash as often as other residents in the area. The friend further stated that dogs in the area had previously gotten into Father's trash, as well as the trash of another nearby resident, and dragged it out.

The issue of dogs getting into the trash has evidently not resulted in any day-to-day impact on the yard. Indeed, if dogs have taken the trash out from where it is collected, the trash has apparently been dealt with by Father or others. As Father's friend stated in reference to the fact that trash was still collected behind the berm, "[B]esides that, [Father] has picked up the gist of his yard." As already noted, this point about Father's maintenance of the yard was also supported by the photographs taken from the phone of the GAL's son.

One other point of discussion regarding Father's home has related to the fact that a portion of the home's underpinning was missing at the time of trial. Father stated he had replaced this section several times after loose neighborhood dogs tore it down. Although a portion of the underpinning was missing at the time of trial, we fail to see how this creates a serious issue that makes the home unlivable or inappropriate. No evidentiary foundation was established at trial explaining how missing underpinning created a serious safety issue with respect to this particular property and home, other than by rank suggestion. Notably, when Father was asked by counsel for the Grandparents if the purpose of the underpinning

---

[19] The GAL questioned the case manager about whether there were some weeds shown in the photographs. Although it is true that there appear to be some small shrubs or weeds near one side of the house, we fail to see how these create any issue here. The front yard itself appears cut and maintained. There is a small pile of something at one place in the yard. The pile does *not* appear to be a collection of multiple items. The suggestion of the GAL was that this pile was trash, but we note that when Father was confronted with recent photographs of his home and asked about whether there was trash, he testified that the claimed "trash" was just a tarp cover for his lawnmower. Moreover, as we have already noted, testimony at trial indicated that Father had "picked up the gist of his yard and has just started to consolidate a lot of that stuff a lot better."

was to make the residence safe for children, Father replied, "Actually, underpinning is to stop pipes from freezing." Although we will not quibble with the notion that it would probably be best if the home had underpinning around its entire perimeter, it seems a stretch to conclude that this fact alone clearly somehow warrants a determination that the home was environmentally inappropriate and would therefore cause the Children to be subjected to "abuse or neglect," preventing their safe return to Father's care, within the meaning of this ground for termination.

In light of the above, we conclude that there is a lack of clear and convincing evidence that Father's home is inappropriate. As it is, the proof suggests it was habitable and not inappropriate for children at the time of trial.[20] Because it is apparent that the "conditions" the trial court found problematic under Tennessee Code Annotated section 36-1-113(g)(3)(A) related to Father's home, the trial court's order is reversed with respect to this ground for termination in light of our discussion herein.

*Failure to Manifest an Ability and Willingness to Personally Assume Custody or Financial Responsibility of the Children*

We close our discussion by turning to the ground for termination codified at Tennessee Code Annotated section 36-1-113(g)(14). This ground for termination, which the trial court held was established, applies under the following circumstances:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, **and placing the child in the person's legal and physical custody would pose a risk of substantial harm** to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14) (emphases added). As evident by the language emphasized above, a finding that placing the child in the parent's custody would pose a risk of substantial harm to the child is a necessary component of the statutory ground. The trial court's order in the present case did not make this finding, and its reliance on this ground for termination was therefore in error. We hereby reverse the termination order with respect to this ground for termination.

## CONCLUSION

For the reasons stated herein, we affirm the trial court's conclusion that neither of the pursued grounds alleging Father's abandonment apply but reverse the court's order with respect to the remaining grounds for termination it held were established. In light of

---

[20] Although Father did not regard his home as inappropriate for living in, he did state that he was also working on plans to purchase land and a new home.

- 17 -

there being no ground for termination in this case, we leave undisturbed the trial court's denial of the petition to terminate Father's rights.[21]

s/ Arnold B. Goldin
_____
ARNOLD B. GOLDIN, JUDGE

---

[21] Because we conclude that no ground for termination was properly established, we do not address the trial court's conclusion that there was insufficient evidence that termination was in the Children's best interests. Lastly, although we note that Father's brief contains argument that appears to ask for attorney's fees in connection with this appeal, we observe that a request for fees was never made in his "Issues Presented for Review" section. Whereas Tennessee Code Annotated section 27-1-122 does give this Court discretion to award attorney's fees on its "own motion" under certain circumstances, *see* Tenn. Code Ann. § 27-1-122, we decline to award attorney's fees for this appeal.